Molineaux v. Raynolds.

---

### EDWARD L. MOLINEAUX

*v.*

### CHARLES T. RAYNOLDS and THOMAS B. HIDDEN.

1. Partnership real estate is regarded as personalty so far as it is required to pay firm debts.

2. As a general rule there can be no partition of firm realty so long as there are firm debts outstanding. This rule is to secure the right of each partner to have firm property applied to the payment of firm debts, in order that he may be discharged from personal liability for them; therefore, if it appears that the realty will not be called upon to pay firm debts, a partition of the same may be decreed.

3. Upon the dissolution of a partnership, the assets are applicable to the payment—*first*, of firm debts due to non-partners; *second*, of advances made to the firm by partners; *third*, of capital contributed by each partner. The residue is divisible as profits equally between the partners, unless a different method of division is stipulated for.

4. When, by agreement, each partner had the privilege of leaving in the business of the firm, as contributions of capital, all or a part of his share of the profits set apart to him at the end of each year, then, upon dissolution, such portions of profits undrawn will be payable as capital.

5. When, upon dissolution, the partners agree upon a valuation of the firm assets at a sum not in excess of the entire amount of the capital which has been contributed, and the personal property is turned over to a new firm upon the basis of such valuation, and the real estate is retained by the members of the old firm, their respective interests in the real estate will be in proportion to their contributions of capital.

---

On final hearing on pleadings and proofs.

*Messrs. A. Q. Keasbey & Sons* and *Mr. Hugo Hirsch* (of the New York bar), for the complainant.

*Messrs. Copeland & Luce* and *Mr. George S. Hamlin* (of the New York bar), for the defendants.

REED, V. C.

This bill is filed for a partition of a tract of land upon which is a factory, at Bergen Point, New Jersey.

It is admitted that the present owners of the property are Charles T. Raynolds, Thomas B. Hidden, the two defendants, and General Molineaux, the complainant. It is also admitted that they own it as partners.

It is admitted by counsel that if the property is subject to a partition suit it should be sold and not divided. Two questions are presented for solution. The first is whether the suit for partition is well brought. If it is properly brought, then the second question is, What are the proportionate interests of the owners in the property?

It is essential to a clear understanding of the second of these questions and in a degree of the first, that the manner in which the property in question was created and how it is now owned, should be set out in detail. It appears that previous to the year 1867 there existed a firm, under the name of Raynolds, Pratt & Company, of which firm the parties to this bill were members. In 1867 a new partnership was formed, consisting of four persons, namely, Raynolds, Hidden, Richardson and Molineaux. By the terms of the partnership agreement, each was to put into the new firm, as capital, the amount of interest which each had had in the old firm of Raynolds, Pratt & Company, and Molineaux was to put in $20,000 in addition. This agreement continued until 1875. Between 1867 and 1870, one Aquilla Rich became a member of the firm, and, in 1870, a deed for the property now in question was made to the five partners. In 1875 a new agreement was made between these partners. In this agreement the capital stock contributed by each was set forth. It was stated that Charles T. Raynolds' share of contributed capital was $450,000; Hidden's share, $250,000; Richardson's share, $138,000; Molineaux's share, $100,000; Rich's share, $33,000. By the terms of the agreement the net profits were to be divided, as follows: To Raynolds, thirty-three per cent.; to Hidden, twenty-two and one-half per cent.; to Richardson, fifteen per cent.; to Molineaux, fifteen per cent., and to

Rich, twelve and one-half per cent. The several partners were to receive interest on their capital up to certain amounts, and were to share net profits according to the agreement above stated. This agreement continued until 1882, when another agreement was entered into. In this agreement also the amount of capital contributed by each was stated, namely, Raynolds, $450,000; Hidden, $250,000; Richardson, $138,000; Molineaux, $138,000; Rich, $33,000. The net profits were to be divided as in the last-mentioned agreement, and interest was to be paid on capital in the same way. In 1884 still another agreement was made. In this agreement the amount of capital stock contributed by each was stated as follows: Raynolds, $500,000; Hidden, $350,000; Richardson, $37,000; Molineaux, $160,000; Rich, $27,000. The net profits were to be divided as follows: To Raynolds, thirty-three per cent.; to Hidden, twenty-four per cent.; to Richardson, twelve and one-half per cent.; to Molineaux, eighteen per cent., and to Rich, twelve and one-half per cent. Interest on capital was to be paid as before. This agreement was to last for five years. Shortly before the termination of this agreement, three of the partners (the parties to this suit) purchased the interest of two of the parties, namely, Richardson and Rich, paying therefor the sum of $40,000. Each of the three purchasing partners contributed to pay the consideration, the same proportions that they had contributed capital. Shortly after the purchase of these interests, Charles T. Raynolds having become insane, a new agreement was executed, by which the interest of Charles T. Raynolds in the personal property, machinery and fixtures of the firm was purchased by the other two partners, together with one Edward H. Raynolds. By this arrangement all the property of the firm, except the real estate, was transferred to a new firm, consisting of Thomas B. Hidden, Edward L. Molineaux and Edward H. Raynolds. By this agreement all the liabilities of the old firm were assumed by the new firm, with the exception of one liability, in the shape of a suit then pending against the firm, brought by one De Floras. This transaction wound up the business existence of the old firm, leaving as undivided assets the property in question and one

36

other piece of real estate situate in Brooklyn, New York. These properties, therefore, belong to the members of the old firm, the three parties to this suit.

The first question mooted springs out of the existence of the De Floras suit. The counsel for the defendants insist that so long as any claim against the old firm remains unsatisfied, so long each partner has a right to have the firm assets held as such to be applied in liquidation of the claim; that until all such claims are satisfied, no partner has a right to demand a division of the firm property.

The equitable rule thus invoked is entirely settled. The property of a firm, whether personal or real, is a fund to be primarily applied to the payment of its debts, and each partner has a right to have it so appropriated, to the end that he himself may be relieved from any personal liability to answer for the firm debts. In England, land as well as personalty belonging to a firm is regarded as personal assets. *Lind. Part.* ¶ *343.*

In this country the land is held to be personal assets so far only as it may be needed to pay firm creditors. *Bank of the Metropolis* v. *Sprague, 5 C. E. Gr. 13; Freem. Part.* ¶ *118.*

Out of this equity of each partner to have the firm property applied to the payment of firm debts in order that he may be discharged from personal liability, has emerged the rule that the partition of the real property of a firm will not be decreed so long as debts of the partnership remain unliquidated. *Penny-backer* v. *Leary, 65 Iowa 220; Kruschke* v. *Stefen, 83 Wis. 373; Mendenhall* v. *Benbow, 84 N. C. 646; Freem. Part. 443.*

By the rule laid down in these cases, the only method by which a partner, under such conditions, can compel a division of the firm property, is by a bill to administer and settle the partnership affairs.

It is apparent, however, that inasmuch as the ground for refusing partition is that partners may be protected from future calls to pay firm debts, therefore, if it should be made to appear that the property involved in the application for partition will not be needed to meet such obligations, the objection to the distribution of the property disappears.

Now, it appears in this case that there is other real estate in Brooklyn belonging to this firm of the value of $150,000. It also appears that the De Floras suit is pending in the courts of New York. The property and the pending suit are therefore both in the state of the firm's domicile. It is beyond the realm of probability that the final judgment in the De Floras suit, which suit has been dragging along for twenty years, can reach an amount which will begin to exhaust the Brooklyn property. Although it appears that a proceeding for partition of that property also had been commenced in the courts of New York, that proceeding has not gone to a decree, and it is in that suit that the defence set up here can be more appropriately interposed. Under these conditions, I do not see any substantial ground for thinking that the interest of any member of the firm will be menaced by the severance of the title to this property as is proposed by this suit.

The second question is therefore presented—what are the proportionate interests of these parties in this real estate?

The contention of the complainant is that this real estate represents accumulated profits, and therefore should be divided in the proportions to which the several partners were entitled to share in profits.

The contention of the defendants is that this real estate represents capital, and it should be divided in proportion to each partner's contribution of capital. Inasmuch as the partners, under the different partnership agreements, were entitled to share in profits in proportions differing from his proportionate contribution of capital, it follows that by the adoption of the one or the other of these theories the interest of the complainant in the firm property is differently affected.

As has been already displayed, these partners had transacted partnership business, under successive agreements, from 1867. Each agreement set out the amount of capital which each partner had contributed and prescribed the proportion of profits to which each partner was to be entitled during the term of the partnership. He was also to have the right to draw interest upon his capital. Now, some partners drew out all of their

interest and all of their profits; others let a portion of their profits or a portion of their interest remain in the business. By the apparent acquiescence of all the partners, the balance of these profits or interest remaining at the end of each year undrawn was added to the amount of the capital of those of the partners who saw fit to permit it to remain in the business. By reason of the unequal additions to the capital from year to year, the proportions of capital respectively contributed constantly shifted and the total amount of capital contributed by all increased.

Now, the theory of the complainant is that the original amount of firm property was increased by the employment of the profits which were permitted to remain in the business, in improving and purchasing property.

It is insisted that by the sale of the personal property by the old firm to the new firm in 1889, the members of the old firm were paid for all the property which represented the product of the original capital, and that what remained is to be regarded as the product of the profits, and should therefore be divided as such.

Now, it seems to be entirely clear that at the end of each year the net profits of the business were divided between the respective partners, in the proportions in which profits were to be divided by the terms of the agreement. It is clear that when these profits were calculated and divided according to the terms of the agreement, and the share of each partner was put to his credit, then, as between the partners, these profits ceased to be assets of the firm and became debts due from the firm to each member of the firm. The sum set apart to each partner at the end of each year was at the disposal of the partner as so much cash put to his credit. He could draw it out and use it as he chose. If he chose to invest it in the business, it was to be regarded as any other money which he saw fit to so invest. It became a part of the capital or it became a loan, just as he and the partners agreed. That they agreed to regard these sums as additions to the capital appears beyond all question. Up to 1884 there was not merely a division of calculated profits, but such calculation included all

profits, so that apparently nothing existed in the shape of undivided earnings.

This appears from a fact I think proven, *i. e.*, that in the calculation of profits all moneys spent in betterments were eliminated from the debit side of the account. Mr. Mather, the bookkeeper, swears positively that no expense for permanent improvements, but only expenses for repairs to the real estate and machinery, were deducted from the gross earnings of the business in arriving at the net profits.

Each partner, therefore, received as a credit for his share of the profits the same amount that he would have received had no permanent improvements upon the firm property been made. The expense of the permanent improvements was a debt against the firm assets, and when paid was necessarily paid out of the new capital which the partners contributed by leaving a portion of their credit for profits and interest in the business of the firm. This portion, as already observed, after being calculated and credited, was equivalent to cash, and if left in the firm business is to be regarded as capital. Again, each of the parties has acquiesced in the view that his interest in the property was in proportion to his contributions of capital.

In March, 1889, as already stated, the interest of two of the partners, Richardson and Rich, were purchased by the three remaining partners. The interest of these two partners, whether something or nothing, was paid for by the three partners in proportion to their capital. The purchase eliminated any claims which the selling partners might have had to share in the assets of the firm, and transferred such claim to the three remaining partners. The manner by which this purchase was made and paid for, indicates that the view of the parties was that the right of each in all the assets was in proportion to his capital.

Again, in May, a new firm was formed, comprised of the two old members, Hidden and Molineaux, and a new member. By reason of Raynolds' insanity, it became essential to ascertain the amount of Raynolds' interest in the firm. The ascertainment of this necessarily involved the ascertainment of the proportionate interests of Hidden and Molineaux. In accordance with

the result of this adjustment of values, the personal assets of the old firm were to be turned over to the new firm.   An expert was put upon the books to discover any error in bookkeeping which might have crept in during the number of years covered by the partnership transactions, so that a final accurate account might be stated.   With the consent of all the parties connected with the old and the new firm, such an account was stated, and upon the basis of such statement the personal property of Raynolds was purchased, and the personal property of Hidden and Molineaux in the old firm was transferred to the new firm.   In making up the valuation of the property of the old firm, the real estate was valued at $289,200.   The real estate did not pass to the new firm, but was retained by the three old members.   In fixing the value of all the property, the value of the real estate was deducted.   In fixing the value of the interest of each partner in all the property, his proportionate interest in the real estate was deducted from his proportionate interest in all the property.   Now, the deduction, on account of Raynolds' interest in the real estate, was calculated in accordance with the relative amount of capital which he had contributed to the firm. In other words, his share in the personalty was sold upon the theory that his proportionate interest in the real estate, as well as in the personalty, was fifty of the one hundred and one parts, and the real estate was retained upon that theory.   It will be perceived that the adoption of this theory in respect to Raynolds' interest involved as a sequence the adoption of the same theory with respect to the interest of Hidden and Molineaux. It is also perceived that if Molineaux's proportionate interest in the real estate, as is now claimed, is not in proportion to his capital contributed, which is sixteen of the one hundred and one parts, but is two per cent. more, then it follows that the deduction from the amount received by Raynolds on account of his interest in the real estate retained was excessive, and therefore what he received for the personalty was inadequate.   This follows from the fact that if Molineaux's share was larger, Raynolds' must be smaller, else the proportions could not be preserved.   In fact, to

Molineaux *v.* Raynolds.

accord to Molineaux what he now claims, the entire settlement must be overturned and a new one adopted.

In view of these facts, namely, that from 1867 to 1889 the profits have been divided; that they had been (if the partners pleased) added to the capital; that the purchase of the two partners' shares was made upon the basis of the proportion of capital contributed; that the calculation and settlement of the Raynolds interest in all the property was made upon the same basis; that the books of the firm were open to each member of the firm, and that at the end of each year (as Mr. Mather says) the balance-sheet of the firm's business and division of profits was given to each partner, and invoked no complaint—I say that, in view of all this, no court would be justified in unsettling this deliberate adjustment of the partnership affairs, unless in case of fraud or gross mistake. No such fraud or mistake is apparent.

But the complainant insists that by the sale made by the old firm to the new firm in 1889, all the capital contributed by the parties to this suit to the firm's business was paid, therefore the real estate left remaining must be divided as profits.

The legal ground upon which it is sought to rest this insistance is well established. Upon the dissolution of a partnership, after the payment of firm liabilities, the amounts contributed as capital by each partner are to be paid.

If there is a surplus, it must be divided as profits, and if there is a deficit the loss must be borne in the same ratio. Mr. Justice Lindley, in his work on *Partnership, marg. p. 402,* lays down the following rules for the adjustment of partnership accounts upon dissolution. The assets are to be applied:

"1. In paying the debts and liabilities of the firm to non-partners.

"2. In paying to each party ratably what is due from the firm to him for advances as distinguished from capital.

"3. In paying to each partner ratably what is due from the firm in respect of capital.

"4. The ultimate residue, if any, will then be divisible as profits between the partners in equal shares unless the contrary can be shown."

It follows, of course, that if the contrary is shown the residue must be divided in accordance with such showing. There can therefore be no doubt that, upon the assumption that there was a surplus, the parties to this suit, as partners, were entitled to be paid before the division of such surplus only the amount of capital which each had contributed. Nor can there be a doubt that, whether by the enhancement of the value of the real estate or from any other cause, such surplus existed after the payment of the capital, such surplus would be divisible as profits. *Robinson* v. *Ashton, L. R. 20 Eq. Cas. 25.*

As already shown, all the earnings, so far as they could be calculated, had either been drawn out by each partner or had by him been transmuted into capital. Whether there would remain any additional surplus in excess of the amount of contributed capital could only be ascertained by a sale of all the firm property, or by a sale of a part, and an estimate of the value of the remainder, or by an appraisement of the value of all and a division of the same according to the estimated value of the several portions.

In 1889, the old firm, as already observed, was dissolved by the insanity of C. T. Raynolds, and a new firm was formed by Hidden, Molineaux and another Raynolds. The committee of the C. T. Raynolds sold his interest to the new firm, and Hidden and Molineaux transferred their interest in the old to an interest in the new. The property of the old firm was not exhibited for sale, but by an agreement between the committee of Raynolds and Hidden, Molineaux and Edward Raynolds, a price was fixed for all the property of the firm in excess of its liabilities, excepting the De Floras suit. The price or value of all this property was fixed at $1,316,725. At the close of the firm's business the amounts due the partners were, to Raynolds, $583,994.97; to Hidden, $587,368.28; and to Molineaux, $145,163.37. The total was the same as the amount of the estimated value of the firm assets. The amount of such assets was, in fact, diminished by a deduction made for depreciation in value of the machinery and on account of the irrecoverable overdrafts of Richardson and Rich.

What was actually paid to the committee of Raynolds was his share in the amount of the assets remaining after such deduction, namely, $539,346.76. Hidden's share was estimated and turned ·over upon the valuation of $356,314.52, and Molineaux at the valuation of $130,874.94. From these amounts was deducted the estimated value of each partner's share in the retained real estate, and the balance was paid for in cash or credits of different kinds upon the books of the new firm. Now, in the agreement of 1884, it was stated that the amount of capital contributed by each was, Raynolds, $500,000; Hidden, $350,000; and Molineaux, $150,000. If the subsequent profits, which had been divided and credited to Raynolds and Hidden and left undrawn, together with the undrawn interest, are to be regarded as additional capital, then it is perceived that all the property of the firm was needed to pay capital.

If it should be conceded that the amounts to the credit of Raynolds and Hidden, in excess of the $500,000 and $350,000, respectively, represented profits and interest, then such shares of undrawn profits so divided and credited, together with the interest, were debts of the firm to the partners as for advances.

Therefore, in pursuance of the rule already announced, they were payable before the capital. After such payment, the remainder of the firm property, as valued, was insufficient to pay the amounts of capital stated to have been contributed in 1884. In this balance Molineaux would have the right to share in the ratio of sixteen of the one hundred and one parts, assuming that his capital has not been depleted.

If, as in fact, it has been depleted, then his share would be less. The real estate representing a portion of such balance of the firm assets is divisible in the same ratio.

I am unable to perceive how the complainant's interest in the real estate can exceed sixteen of the one hundred and one parts upon any hypothesis which has been or can be propounded.

I will advise a decree in conformity with these views.